James McCall, Esq.
Idaho Attorney ID 7285
368 Sherman Street
Boise ID. 83702
Telephone: 208-731-4897
*Email: jameskmccall@gmail.com*
*Attorney for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| JAMES McCALL AND SAMIA McCALL, | ) | |
| ADMINISTRATORS AND PERSONAL | ) | Case No. |
| REPRESENTATIVES OF THE ESTATE OF | ) | |
| M.M. AND HEIRS, INDIVIDUALLY AND ON | ) | |
| BEHALF OF C.M. AND S.M., MINORS BY | ) | |
| AND THROUGH THEIR GUARDIANS | ) | Civil Case |
| JAMES McCALL AND SAMIA McCALL | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | |
| V. | ) | |
| | ) | |
| BOISE SCHOOL DISTRICT, THE IDAHO | ) | |
| DEPARTMENT OF EDUCATION, RYAN | ) | |
| GANT, PAMELA DIETZ, HELGA FRANKENSTEIN, | ) | |
| ANGELA KULM, DAVE WAGERS, JOHN AND/OR | ) | |
| JANE DOES(S) IN THEIR INDIVIDUAL CAPACITIES. | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## COMPLAINT AND JURY DEMAND

**as COMES NOW** the Plaintiffs, James McCall and Samia McCall, Administrators and
Personal Representatives of the Estate of M.M. and heirs, in their individual capacities, and
on behalf of C.M. and S.M., minors, by and through their parents and natural guardians,
James McCall and Samia McCall, alleging the following:

## Preliminary Statement

1) This is, among other claims, a civil rights action brought by Administrators and Personal Representatives of the Estate of M.M. and heirs, and also on their own behalf, and C.M and S.M., minors, by and through their parents and natural guardians, James McCall and Samia McCall, against the Boise School District ("District"), the Idaho Department of Education ("IDOE"), and Ryan Gant, Pamela Dietz, Helga Frankenstein, Angela Kulm, and Dave Wagers in their professional and individual capacities.

2) Plaintiffs allege that the District, the IDOE and Ryan Gant, Pamela Dietz, Helga Frankenstein, Angela Kulm, and Dave Wagers illegally discriminated against M.M. with deliberate indifference and denied her a free and appropriate public education ("FAPE") by failing to identify her as a protected handicapped student and by failing to provide her with appropriate disability-based accommodations, despite actual knowledge of disability and concerns that should give rise to a comprehensive assessment, and as a result of such discrimination and deliberate indifference deprived Plaintiffs of their due process rights under the law.

3) Plaintiffs further allege that these actions were in violation of both the Child Find Requirements of Section 504 of the Rehabilitation Act of 1973 ("Section 504"), Title II of the Americans with Disabilities Act (the "ADA"), and additionally and separately, the Individuals with Disabilities Education Act ("IDEA"), such that M.M. was deprived of a free and appropriate public education and accommodations under the ADA, due process rights under these laws, and suffered immense harm through the concerted actions and inactions of the Defendants including ignoring numerous inquiries, and red flags with

OCD, social emotional difficulties, executive functioning problems, anxiety and autistic and ADHD traits.

4) Plaintiffs assert that the District, the IDOE, in its supervisory capacity, and the other Defendants maintain policies and practices of failing to identify students who require comprehensive assessment for disability, mental health services, reasonable accommodations. Plaintiffs further allege that the Defendants failed to properly train and supervise their personnel in identifying and supporting students requiring these services. Plaintiffs allege that Defendants' failure to follow these laws, their own policies, rise above mere negligence and their duties were knowingly disregarded to avoid the financial impact of having to follow the law and provide special education and ADA compliance. These actions, among other things, rise to the level of deliberate indifference to the rights of Plaintiffs, under IDEA, ADA, and the United States Constitution. Plaintiffs further allege that IDOE violated Section 504, the ADA and the IDEA by failing to provide procedures sufficient to ensure that the District complied with its Child Find requirements.

5) Plaintiffs assert that Boise School Board Chairman Dave Wagers disregarded specific warnings from Samia McCall regarding escalating suicide risks in the community, including a documented email on February 4, 2022, and has failed to provide, and continues to neglect, adequate training and supervision for District employees to fulfill their affirmative Child Find obligations under federal law. Despite multiple student suicides within the Boise School District, including incidents reported in 2022 and 2023, Wagers, in his supervisory role alongside other Defendants, has upheld policies and practices that fail to identify students needing comprehensive disability assessments,

mental health services, or reasonable accommodations. Plaintiffs further allege, based on information and belief, that Wagers has not investigated whether the District and its staff adhered to established child find, suicide prevention, and postvention policies following these deaths. Additionally, a documented pattern exists where District employees, in both supervisory and non-supervisory positions, have inflicted physical, sexual, and emotional harm on students, with those in authority systematically concealing these acts or protecting the perpetrators, as evidenced by prior unreported abuse cases. This reflects a pervasive institutional and supervisory failure, amounting to deliberate indifference and a state created danger toward all children in the District, including Plaintiffs, by neglecting legal and policy mandates. Plaintiffs contend that Defendants' deviations from these obligations, driven by financial motivations, exceed mere negligence and constitute deliberate indifference to Plaintiffs' rights under the Individuals with Disabilities Education Act (IDEA), the Americans with Disabilities Act (ADA), and the United States Constitution.

6) Plaintiffs allege that Defendants, through specific acts including the failure to assess M.M.'s disabilities despite repeated parental notifications (e.g., August 20, 2020, and May 5, 2023, suicide attempt) and the neglect of a reintegration plan post-hospitalization, violated their substantive due process rights under the Fourteenth Amendment. This includes the liberty interests of James McCall and Samia McCall in the care and companionship of their child, as evidenced by their thwarted efforts to secure accommodations, and M.M.'s right to life and bodily integrity, compromised by the District's inaction amid known mental health risks. Additionally, M.M.'s siblings, C.M. and S.M., suffered loss of society and deprivation of their individual liberty interests,

such as ██████████████ and S.M.'s school refusal following M.M.'s death on November 2, 2023. These actions, undertaken by government officials under color of state law, are brought pursuant to 42 U.S.C. § 1983, which prohibits the deprivation of constitutional rights, with deliberate indifference shown through the District's failure to act despite actual knowledge of substantial risks. Additionally M.M.'s siblings suffered their own loss of society and deprivation of their individual liberty interests. These actions and inactions, undertaken by government officials under color of state law, perpetuate a policy, practice, and custom of harm to a protected class of disabled children and neurominorities (who face disproportionately elevated risks of bullying, exclusion, anxiety, depression, and death, as supported by national studies and local incident reports) and are brought pursuant to 42 U.S.C. § 1983, which prohibits the deprivation of constitutional rights, with deliberate indifference demonstrated by the District's failure to act despite substantial likelihood of harm, rising to conduct that shocks the conscience.

7)  Plaintiffs, as M.M.'s heirs, allege that the District's actions and inactions constitute a claim for wrongful death under Idaho statute.

8)  Plaintiffs further allege that the District failed to provide appropriate and sufficient accommodations and/or supports to M.M. after her suicide attempt and C.M and S.M after M.M.'s death, violating their rights under Section 504 and the ADA.

9)  Plaintiffs seek declaratory and injunctive relief, as well as compensatory damages, to remedy the Defendants' discriminatory and unlawful acts. Plaintiffs seek injunctive relief to change the District's and IDOE's unlawful practices and to ensure its employees are both aware of their affirmative responsibilities under the ADA, 504 and IDEA to reasonably undertake measures to assess, identify and provide services to students with

disabilities and mental health conditions outlined under the law, including, but not limited to, those with higher cognitive skills.

10) Moreover, Plaintiffs seek injunctive relief to change the Idaho Department of Education's unlawful practices and to immediately ensure they undertake measures to train, prepare policies not in contravention of the law and their own previous research, and provide reasonable direction for its employees to, assess, identify and provide services to students with mental health conditions and other disabilities. Without change the IDOE continues to enact immense harm and deprivation of due process under IDEA, ADA, 504 and the US and Idaho constitutions to all children in Idaho, including the Plaintiffs.

11) IDOE failed to adequately supervise the District rising to deliberate indifference to the 14th Amendment constitutional rights of the Plaintiffs.

12) Plaintiffs also allege that IDOE knowingly and indifferently discriminated against M.M., C.M and S.M. through failing to ensure compliance or remedy the District's failure to appropriately evaluate and identify them as protected students with covered disabilities which excluded them from participation in, denied them the benefits of, and subjected them to discrimination at school, and immense harm and unnecessary suffering.

13) Plaintiffs further allege that certain DOE Defendants after M.M.'s death systematically destroyed all items belonging to M.M stored in their locker, including papers turned in, notebooks, artwork, digital records, and any materials containing the child's name. Plaintiffs aver that these acts constitute an unlawful taking in violation of the U.S. Constitution, contravene the requirements of FERPA and Idaho record retention laws when litigation is reasonably anticipated, and inflict severe intentional and/or negligent emotional distress upon Plaintiffs. Plaintiffs further aver, that District employees in a

supervisory role have engaged in concealment of misconduct and protection of tortfeasors in other cases in the District, therefore it is reasonable to aver that these actions are with malice, deliberate indifference, and intentionality.

## Parties

14)  M.M. was born on October 9, 2009. At all times relevant, M.M. resided in the Boise School District and attended the District for almost the entirety of her education, from the second grade through entry into her 8th grade year, until her death.

15)  Plaintiff, C.M., is a 17-year-old student who should have been comprehensively assessed under IDEA and ADA.  In his Sophomore year, through private assessment, and then through working with Boise High School, he has been determined by Defendant to be eligible for accommodations under Section 504 of the Rehabilitation Act ████████ ███████████████████████████████████ At all times relevant, C.M has resided in the Boise School District and has attended second grade through present day, his Senior year. After M.M.'s death, Plaintiffs requested certain accommodations for C.M on November 5, 2023, and January 17, 2024. Boise High School's counselor provided C.M.'s parents with written notice of their due process rights upon the Plaintiff's request for 504 accommodation. This was the first time the Plaintiffs were provided with notice of their due process rights under IDEA, ADA, and 504 despite requesting accommodations for M.M.  Plaintiffs were not aware of their due process rights until receiving this notice.

16)  Plaintiff, S.M., is a 14-year-old student who should have been comprehensively assessed under IDEA and ADA and made eligible for accommodations under Section 504 of the Rehabilitation Act ████████████████████████

██████████████████████████ At all times relevant, S.M has resided in the Boise School District. S.M attended school in the District through the end of 2023. Currently, and understandably, he is unable to attend a traditional school environment, and parents are ████████████████████████████████████████ ████████████████████████████ and suffered and he continues to suffer harm through the actions and inactions of the Defendants.

17) Plaintiff, James McCall, is the parent of C.M and S.M and serves as their guardian. He is also M.M.'s parent, and the Administrator and Personal Representative of M.M.'s estate. At all times relevant, they resided in the Boise School District. He is also M.M.'s heir.

18) Plaintiff, Samia McCall, is the parent of C.M and S.M and also serves as their guardian. She is also M.M.'s parent, and the Administrator and Personal Representative of M.M.'s estate. At all times relevant, they resided in the Boise School District. She is also M.M.'s heir.

19) Defendant, Boise School District, is an educational institution with multiple locations, including a Central Administration Office located at 8169 West Victory Road, Boise, ID 83709. The District was M.M.'s and is C.M.'s and S.M's Local Education Agency ("LEA") within the meaning of the IDEA and is a recipient of federal funds, and is therefore legally bound by the provisions of Section 504, the ADA, and Section 1983.

20) At all times material and relevant hereto, the District acted by and through its agents, employees, servants, and officers, including the named Defendants in both their official and individual capacities.

21) Defendant IDOE, is a governmental agency and a state educational agency as defined by the IDEA. IDOE is a proper defendant for a systemic IDEA and Section 504 claim

because of its affirmative duty to ensure that each child within its jurisdiction is provided a FAPE, each LEA is properly directed and notified of their affirmative obligations to competently carry out Child Find responsibilities under federal and state law and IDOE may be held responsible if it fails to comply with its duty. *Hernandez v. Grisham,* 508 F. Supp. 3d 893 (D.N.M. 2020); *Clovis Unified School District v. California Office of Administrative Hearings*, 903 F.2d 635 (9th Cir. 1990); *Kruelle v. New Castle County School District,* 642 F.2d 687, 697 (3d Cir. 1981). IDOE is the proper party against whom injunctive relief is sought to address the systematic failures of the District and all LEAs under its purview to comply with applicable law, allocate the budget, remedy shortfalls, and properly train and supervise LEA's under its supervision.

22) Defendants Ryan Gant, Pamela Dietz, Helga Frankenstein, Angela Kulm, and Dave Wagers, each in their individual capacities as District employees, demonstrated deliberate indifference to Plaintiffs' constitutional rights through their actions and failures to properly train and supervise, resulting in substantial harm to Plaintiffs.

23) Defendants, John and Jane Doe are responsible for the intentional infliction of emotional distress, violation of the Plaintiffs' constitutional rights, and violations of FERPA through a systematic failure to preserve items that M.M. had at school. Inexplicably, her locker was stated as being 100% empty, they provided zero documents and any of her school work, the District immediately deleted all access to Infinite Campus and failed to provide any of these documents and property to M.M.'s parents and heirs. Additionally, there has been a systematic pattern of the District covering up and protecting perpetrators rather than children's victims and whistleblowers in the District.

**Jurisdiction and Standing**

24) This Complaint seeks appropriate relief for violations and denial of equal access to education pursuant to the IDEA, Section 504, the ADA, Section 1983, and the United States Constitution, including the Fourteenth Amendment.

25) This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. In particular, this action asserts federal questions under 42 U.S.C. § 1983, 29 U.S.C. § 794 ("Section 504"), Title II of 42 U.S.C. § 12132 et seq. ("ADA"), and 20 U.S.C. § 1400, et seq. ("IDEA").

26) The declaratory and injunctive relief sought is authorized by 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983 and Rule 57 of the Federal Rules of Civil Procedure.

27) Wrongful death in Idaho is governed by Idaho Code § 5-311 (action for wrongful death) and the Idaho Tort Claims Act, Idaho Code § 6-901 et seq., which provides for liability of governmental entities for negligent or wrongful acts. The Idaho wrongful death claim is a state-law tort action, arising from similar facts and circumstances as the federal claims including the § 1983 claim. Jurisdiction is proper as it is the same case or controversy, therefore we ask that this court exercise supplemental jurisdiction over the state claim under 28 U.S.C. § 1367. The claims should be litigated together in the interest of judicial economy and efficiency for all parties.

28) All Defendants' actions and inactions complained of herein took place within the jurisdiction of the United States District Court for the District of Idaho, and Defendants are present and conduct affairs in this judicial district. Defendants' actions demonstrate a

wanton disregard of federal Department of Education clarifying rules and notices and therefore a conflict between state and federal interpretation makes this judicial district a proper venue.

29) This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391.

## Factual Allegations

30) This action is brought on behalf of the Estate of M.M., who died by suicide on November 2, 2023.

31) M.M. was a 14-year-old individual with friends and a loving family, including two siblings.

32) This action is also brought on behalf of C.M and S.M, M.M.'s older and younger siblings.

33) This action is also brought on behalf of M.M.'s heirs, who are proper parties pursuant to Idaho wrongful death and tort acts.

34) This action is also brought on behalf of James McCall and Samia McCall individually for violations of their rights under IDEA, ADA, and the United States Constitution.

35) M.M. 's parents notified the school over a number of years of various concerns, with emotional regulation, possible obsessive behaviors, motor skills, sensory sensitivities, anxiety, executive functioning deficits, and social and emotional concerns with M.M. and her siblings.

36) M.M. was assessed for "GATE" programs on or around March 26, 2019, by the school psychologist, Angela Kulm.  The assessment should have given rise to additional comprehensive assessments as the school psychologist noted a "flat tone", strong emotional responses, "her eyes welled up" to "perceived failure", time difficulties,

anxiety, and large standard deviations between index scores, coding skills and other index scores.  These standard deviations between index scores are a tell-tale sign of an executive functioning and processing deficit that should also give rise to further comprehensive assessment and trigger the affirmative Child Find obligation.  Angela Kulm as a psychologist has a heightened duty to child find and assess for all areas of disability, including in children with supposed "gifts".

37) M.M. 's parents specifically highlighted on August 20, 2020 anxiety, stress, sleep difficulties and physical manifestations in the body of stress and anxiety to the school counselor, principals, and teachers. M.M. and the school counselor met on August 21, 2020, but the school will not, in spite of many requests, locate any notes or records of this meeting.

38) ███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████ These factors are all indicators of a disability.

39) ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████ The inability to access recess, a critical outlet for self-regulation, further amplifies these struggles, leaving students without an important outlet for sensory or emotional dysregulation relief. In the classroom, constant ambient noise can make it nearly impossible for some children to block out distractions, increasing anxiety and reducing learning capacity. Schools must recognize and accommodate these sensory sensitivities, themselves covered under ADA

and Section 504, to foster a supportive learning atmosphere. ████████████

████████████████████████████████████████████████████████

████████.

40) The school counselor recommended James McCall and Samia McCall buy blue light
blocking glasses rather than recommend a comprehensive assessment when sensory
sensitivities and headaches were caused by excessive time on poorly functioning
chromebooks with terrible latency, and resolution. Plaintiffs requested more items in
paper form but were unaccommodated in this request. Sensory sensitivities and
headaches are also warning signs of disability that should have been assessed and/or
accommodated. Rather than comply with Child Find duties under Federal Law,
Defendants continued to shame Plaintiffs and place blame onto them with deliberate
indifference.

41) There are numerous instances where M.M.'s parents notified the school that she was
unable to attend school for mental health concerns, anxiety, social concerns and school
refusal. For example, on October 16, 2020, an email from Emily Hammond, M.M.'s fifth
grade teacher, who observed M.M. walking the field alone during recess on October 14,
2020, and subsequently joined her. M.M.'s parents relayed that M.M. felt that she had no
friends at school and that they asked the school counselor Laura Adams to help during
recess socially. Once again there was never a comprehensive mental health or disability
assessment ordered or offered.

42) Again, on October 28, 2020, M.M. 's parents spoke with the school counselor, Laura
Adams, and teacher Emily Hammond about school hesitancy, anxiety, and excessive hand
washing that was leaving physical irritation. The school counselor recommended

third-party peer support and counseling, but never recommended any "in school" assessments, comprehensive or otherwise. The counselor did say that she would have someone try to "facilitate" positive peer interactions during recess and that she would check in on or around November 11, 2020.

43) On November 17, 2020, M.M.'s parents mentioned that M.M. insisted that she change her clothes after being in the portable classroom for five minutes.

44) The elementary school counselor, Laura Adams, even suggested an OCD therapy specialist on November 17, 2020, and the parents followed up with the recommendation. M.M.'s parents discovered through following up on this recommendation, that the expert was out of state and did not see children under the age of 13. Once again, the school offered no assessments.

45) On January 1, 2021, and numerous other instances, M.M.'s parents notified the school that M.M. was having difficulty getting assignments done on time or understanding why some were marked missing in the indescribably poor user interface used by the school. These missing assignments would often have already been completed or turned in and would trigger additional anxiety and taxation of overwhelmed executive functioning skills. There are numerous signs of executive functioning difficulties that were ignored by the District, that should give rise to concern over disability requiring assessment and accommodations.

46) On February 17, 2021, M.M.'s parents notified the District that M.M. was upset and would need a mental health day. M.M.'s parents notified them again that M.M. had gone from loving school to dreading it. No assessments were offered or conducted.

47) On February 23, 2021, M.M.'s parents notified school that she was having difficulties as

she often spends the whole day by herself and that they thought it would be positive for her mental health if M.M. could have some positive and meaningful interactions with her peers. Social and emotional challenges are also telltale signs of disability covered under Section 504, IDEA and the ADA. Again, no assessments were offered, no accommodations were offered and Defendants continued to deny Plaintiffs due process under the law with deliberate indifference.

48) On April 16, 2021, M.M. 's parents notified the school that she had a meltdown (a classic indication of neurodivergence with school professionals and experts should be familiar) and that she could not fall asleep until 4AM.  They notified the school that she would not be able to attend school for mental health reasons. Sleep and concentration difficulties are also signs of impairment in functioning and signs of possible disability that should give rise to further assessment and inquiry.

49) When C.M. 's parents learned that the North Junior High principal had waited outside the bathroom to interrogate students, purportedly after reports of a TikTok challenge involving the removal of soap dispensers they were deeply concerned and scheduled a voice conference. The principal questioned C.M. extensively without any evidence of wrongdoing. The plaintiff's parents promptly expressed to the administration that such punitive, surveillance-heavy tactics were contributing to student distress, anxiety, and a rapid decline in mental health. They warned that focusing on punitive measures regarding property damage ignored that such behavior may be a cry for help. They should focus on anger, hurt and anxiety as their focus should be on preventing suicide. These warnings went unheeded, and within two years, the school experienced a tragic rash of suicides, including the loss of M.M.  Current policy at North Middle School has lanyards and

punch cards, where these budding adults can now only go to the bathroom eight times in a semester. This policy is indifferent to the fact that children with disability and anxiety may not feel things in their body, such as a full bladder, in the same way and no heed to females, or those born female, having to navigate the middle school challenges of menstruation.

50) On May 19, 2021, M.M. 's parents notified the school that she was having a mental health day, school resistance and sadness.  Never did the District order any assessments to be conducted.

51) On December 10, 2021, M.M.'s parents asked the school counselor to check in on M.M. as she was "struggling a bit and not really wanting to be at school" and that she was having sleep problems, anxiety and asked to be withdrawn from school.  The school counselor was also notified that M.M. had begun seeing a private counselor for mental health therapy.

52) On February 4, 2022, M.M.'s parents sent a public response to the BSD Trustees and Administration warning them of the sensory issues relating to wearing masks, the inconsistent rules being applied to students, and the overall decline in children's mental health including a dramatic increase in suicide rates.  Board Trustee Wagers acknowledged receipt but declined any offer of understanding the personal experiences of the McCall family or any known action to support children in the District with rising mental health challenges and disability.

53) On February 17, 2022, M.M. 's parents sent the school nurse a response to a COVID survey, that "M.M. 's symptoms are nondescript and mental.  All of my kids are struggling with the social isolation and exclusion and uncomfortableness of having a

mask policy in place.  More closely resembling depression, anxiety and societal angst. So, I am not sure where to put these symptoms in your boxes."  This correspondence, like the others, never triggered further assessment from the District, and never any comprehensive assessment for any of the children.

54) On March 3, 2022, M.M.'s parents notified the school that they thought that too much time spent on chromebooks was causing headaches and other sensory issues.  Sensory sensitivities are another sign of possible autism, ADHD or other covered neurodivergent conditions and signs of impairment in functioning and concentration.

55) After being required to witness graphic war imagery, a seventh-grade teacher's decision to display a napalmed, unclothed minor caused severe emotional distress and anxiety in M.M., violating Idaho Code § 33-512(4) regarding safe school environments. Despite being informed of M.M.'s traumatic response, the school failed to take any action or implement changes to address the situation or support the student's well-being. This lack of intervention exacerbated the harm and disregarded the gravity of the student's emotional needs and also demonstrates a complete lack of understanding in how traumatic images can be internalized in children with sensory sensitivities, autism, and ADHD.

56) On May 5th, 2023, M.M. attempted suicide and was hospitalized in an induced coma and intubated. The District was notified of her medical condition and that she would be unable to "finish" the year and take finals. The attendance office at North Jr. High acknowledged receipt and with it the email banner "Celebrating Neurodiversity" with an infinity symbol.  They may celebrate it, but they infinitely refuse to fulfill their affirmative Child Find duties and assess for disabilities in neurodivergent children.

57) On May 8, 2023, Ryan Gant, the North Jr. High counselor stated that he was "sorry" to hear about M.M. and that he would try to pull together some options.  M.M.'s parents had to proactively reach out to him on May 15, 2023, regarding options and to notify him that M.M. was still hospitalized. Ryan Gant apologized for failing to reach out to M.M. 's parents and notified them that the grades had been frozen on or about May 8th a full week earlier. The school froze her grades, which were all A's.

58) On May 15, 2023, M.M.'s parents asked Ryan Gant about what accommodations she might need at school and to contemplate a possible reintegration plan for M.M. Ryan Gant said that they would reach out before the next school year to work on a reentry plan and "supports" for M.M. at school.  He did not.

59) M.M. was diagnosed with Major Depressive Disorder in the hospital after a brief visit with the St. Luke's child psychiatrist in May of 2023 after her suicide attempt and began receiving outside mental health and additional counseling services in 2023 which was communicated to the District.

60) On August 14, 2023, M.M.'s parents had to proactively reach out to Ryan Gant multiple times regarding a reintegration plan despite his earlier assurances that he would reach out to them, and also M.M.'s parents filled out a Google Form to request a meeting that was ignored.  These actions clearly rise to deliberate indifference where the District, and Ryan Gant, had actual knowledge of M.M.'s suicide attempt and previous self-harm.

61) On August 16, 2023, M.M.'s parents sent to Ryan Gant an email titled "504 Plan for M.M." and that also had a letter accompanying the email from M.M.'s counselor stating that she was diagnosed with Generalized Anxiety Disorder and had requests for

accommodations, including not publicly displaying any of M.M.'s work.

62) In violation of 34 CFR § 104.36, Section 504 Practice Guide and the Idaho Special Education Manual, Ryan Gant, a mere 26 minutes after receiving the email request, stated that this was an easy "accommodation to handle" and that he didn't think that pursuing a 504 Plan was necessary at the time. M.M.'s parents were never notified of their procedural safeguards or due process rights under Section 504 as required by federal and state law.

63) It was M.M.'s parents' understanding that at a minimum, Ryan Gant would reach out to all of M.M.'s teachers and discuss her concerns highlighted in the requested 504 Plan and help provide accommodations to support her reentry back to school, but the deliberate indifference continued.

64) On August 25, 2023, M.M.'s parents had to reach out to her Earth Science teacher and state that she had anxiety related to decision making and that questionnaires were causing her stress. This should have been addressed by a Section 504 request for accommodations or Ryan Gant reaching out.

65) On August 31, 2023, M.M. 's parents had to reach out to another teacher, Donna Hale, and state that when she gets called on or has to publicly show her work, it heightens her anxiety and that she doesn't want to be called on. It doesn't appear that Ryan Gant had communicated any of the concerns in the requested 504 Plan to M.M.'s teachers. M.M.'s parents had to send a copy of M.M.'s counselor's letter requesting accommodations to her English teacher Donna Hale.

66) On October 5, 2023, an email went out to Boise Schools listserv regarding the death of a North Junior High student. It was uncertain to M.M.'s parents what grade the child was or

any of the circumstances. The child, who died by suicide, was one of M.M.'s classmates and also on her cross-country track team and upon reaching school it was very chaotic, upsetting and emotionally overwhelming. M.M. was extremely upset that she was not warned that would be the case. The email said that they would have a "Crisis Team" in place to help during such a difficult time. Upon information and belief, neither M.M. nor her parents, despite her previous suicide attempt and proximity to the student, were ever reached out to by any of the school Crisis Team, or counselors to offer support. The school failed to follow mandatory suicide prevention and postvention protocols required by Idaho Code § 33-136 and the Jason Flatt Act, including proper risk assessment, intervention, and support services for students at heightened risk. These compounding failures include their obligations under the ADA, Section 504, IDEA, and the Jason Flatt Act requirements codified in Idaho statute regarding suicide prevention and intervention led to disastrous results.

67) Despite clear knowledge of the struggles impacting M.M. functioning at school for years, the District failed to initiate an evaluation (comprehensive or otherwise) of M.M. or offer appropriate support to address her needs within the school setting. In addition to continuously ignoring its affirmative Child Find duties the District actively thwarted M.M. and her parents' due process right under Section 504 when accommodation was requested.

68) On November 2, 2023, M.M. died by suicide.

69) The District failed to follow its own suicide prevention, postvention and reintegration policy and demonstrates, again, a failure of IDOE, Dave Wagers, the principals, Helga

Frankenstein, Pam Dietz, and the District, to properly train and supervise its employees and LEA's under supervisory control.

70) This failure to follow their own suicide prevention policies, to carry out any semblance of an action plan, to ignore the increased duty to children known to be at heightened risk of suicide, creates a state-created danger that lead to the deaths of M.M., and perhaps others as well.

71) When their siblings, C.M and S.M, were still sleeping before getting ready for school the next morning, they awoke to the devastation of M.M.'s parents having to call emergency first responders into the house and the death of their sister.

72) M.M.'s parents were (and are) in shock and grief but notified the first responders who arrived the morning of November 3rd that they were directed to contact the school resource officer that it was OK to share with the school the nature of M.M.'s death by suicide and that they were open to receiving support.

73) C.M is currently a 12th-grade student in the District. Throughout his time in the District, C.M has experienced academic success as a result of his strong efforts. That continued into his 10th grade year in 2023-2024 despite ███████████████████████ ███████████████████████████

74) C.M also has a long history of parents requesting accommodations and addressing ███████████████████████████████████

75) The record of C.M is ███████████████████████████ ██████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ These systematic issues where IDOE and the District fail to instigate any Child Find efforts for children of higher cognitive abilities disrupted the trajectory of C.M. 's life, education and caused harm.

76) C.M ███████████████████████████████████████

████████████████████████████████████████████████████

███ In stark contrast to M.M. 's request for Section 504 accommodations, the request for accommodations for C.M. was followed with a notification to C.M.'s parents regarding their due process rights.

77) C.M has ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████

78) C.M. ████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████ These challenges are recognized indicators of underlying disability and highlight the importance of targeted

support and accommodations in the school environment and should trigger an affirmative "Child Find" obligation to identify and comprehensively assess for disability.

79) S.M would currently be in the 8th grade in the District if capable of being publicly enrolled. He has been unable to attend public school since the death of his sibling.

80) Similar to M.M. and C.M. the record is replete with James McCall and Samia McCall

 Never did the District conduct a comprehensive assessment, besides GATE testing. The District harvests the standardized testing of students with disabilities, but deliberately refuses to "Child Find", assess, and provide accommodations for these children when reasonable concerns trigger the affirmative Child Find obligation.

81) S.M. has a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Rather than assess and accommodate the disability, the District shames these kids for their disabilities.

82) Following the tragedy of losing their sibling, the District with deliberate and cold indifference took no steps to provide counseling to M.M.'s classmates or to her siblings.

83) In an effort to support them, James McCall and Samia McCall immediately identified grief counselors, and they began counseling sessions for C.M, S.M individually and as a family.

84) C.M returned to school about one week after their sibling's death and her celebration of life.

85) S.M was unable to return to school. After many conversations with his elementary school about his inability to return physically to school, he was told that he would need to return to school physically after winter holiday break.  S.M.'s parents enrolled him in a private school that was smaller, and more accommodating of neurodivergence, but S.M. was not able to physically return to school and has been homeschooled for the duration of the time since M.M.'s death. ███████████████████████████████████

███████████████████████████It is not that they won't go, it is that they can't go without accommodations, without being harmed.

86) S.M was also privately assessed ███████████████████████████████████

87) Both S.M. and C.M's struggles were apparent, through significant absences and school resistance.

88) The McCall family was extremely hurt that the District failed to mention M.M. in connection with a yearbook and would not allow public displays of grief for M.M.'s classmates and basically pretended that she never existed for the purposes of Mental Health Awareness Month. North Junior High informed grieving parents that nothing special in the yearbook would be done for those students that died by suicide during the school year, including M.M, and that public displays of grief would be allowed or tolerated in contrast to students that died in other ways.  For all intents and purposes, M.M. and her friend group and her siblings were treated as if her name was Voldemort, from Harry Potter, a name that should never be said again.  This causes severe emotional distress in those grieving, including Plaintiffs.

89) Additionally, other parents and teachers wished to contact M.M. 's parents to offer support and were misinformed that the McCall's wanted their privacy rather than support from the community. In some instances, parents reached out to Principals Frankenstein and Dietz and were told specifically to not contact the Plaintiffs. Principal Pam Dietz also told other parents that contacted her, that she had directly reached out to James McCall and Samia McCall to talk. This is categorically false. This intentionally cruel behavior to stonewall community support in a time of loss rises beyond the level of deliberate indifference and into the intentional infliction of emotional distress. The results were to increase the suffering of the Plaintiffs in contravention of their clear wishes. These mistruths resulted in deleterious impacts on the Plaintiffs' mental and physical health. Additionally, the school's destruction of M.M.'s possessions, locker contents, and educational records may violate Idaho public records retention requirements and FERPA., rise to the level to shock the conscience of reasonable people.

90) Plaintiff maintains that, despite knowledge that its policies and procedures were deficient, the District failed to make changes or train staff after M.M.'s death. As a result, the District continues to fail its students, including M.M.'s siblings.

91) The District's failure to appropriately respond to



92) The U.S. Department of Education's Office of Special Education Programs (OSEP) issued formal findings in a letter dated October 20, 2023, followed by a subsequent directive on June 25, 2024, to IDOE regarding deficiencies in its special education

formula; including, deficiencies related to Idaho's eligibility criteria for determining whether a child qualifies for special education and related services under IDEA. The letter outlined a series of corrective actions Idaho must take as a result of findings from the Department's Office of Special Education Programs (OSEP).

93) Key points from the letter included 1) Idaho must review and revise its definition of "school age" so that all children suspected of having a disability, including preschool-age children, can be evaluated for SLD eligibility. 2) Idaho acknowledged that its SLD eligibility criteria are inconsistent with IDEA requirements  3) Idaho  must submit evidence that its SLD eligibility criteria have been reviewed and revised to comply with IDEA within 90 days of the original letter (October 20, 2023) 4) Idaho is required to notify all public agencies, LEAs, parent advocacy groups, the Idaho State advisory panel, and other interested parties once the new criteria are available and to provide training and guidance to ensure consistent statewide implementation.

94) This failure is prima facie evidence that Idaho had failed to properly identify students, failed to train, and also failed to review its statistical anomalous data regarding students eligible for special education. Additionally, it is evidence that they ignored public advocacy groups who tried to bring this to their attention for years prior to this change. Only when OSEP sent a nasty letter did they "choose" to make changes. Idaho's criteria had been out of compliance with IDEA for "years, potentially affecting thousands of students," and that parents and advocates had consistently raised these concerns.

95) James McCall, in his personal capacity as a parent impacted by special education policy, also sent a comment letter June 7, 2024 during the special education manual revision that raised concerns over the special education manual, including that the proposed manual

revisions, did not adequately address the needs of disabled children in the state, especially twice-exceptional students who are both of high cognitive ability and disabled.1) The manual defined "twice-exceptional" but does not provide meaningful guidance or practical policies for identification and support, making the definition functionally "hollow." The comment references better definitions and recommendations from Idaho's 2010 manual and a 2022 state report, both of which acknowledge the challenges and needs of twice-exceptional students 2) the comment requested changes to make clear that comprehensive teacher training, clear identification processes, and development of Individualized Education Programs (IEPs) that take into account students' strengths and challenges are important. It recommends the intentional inclusion of 2010 manual guidelines in the current revisions. 3) The manual's definition of "emotional behavioral disorder" is unnecessarily restrictive and inconsistent with federal law (IDEA), requiring more evidence and higher hurdles for qualification than the federal standard. The comment suggests reverting to the less restrictive, federally-aligned definition of "emotional disturbance." 4)  The comment reminded, yet again, of the affirmative obligation to identify and support all children with disabilities, emphasizing that this should include children who are gifted, high-achieving, and/or have hidden disabilities regardless of obvious academic struggles. 5) The comment notified that not allowing anxiety and emotional distress to be accommodated for purposes of standardized testing is harmful and likely contrary to law and 6) the comment highlighted the perverse financial incentives to "not evaluate", and not find, due to the fact that it often costs money to provide special education services.

96) State Superintendent Debbie Critchfield has acknowledged an unprecedented funding

shortfall of over $80 million for Idaho special education, making clear that the Idaho

Department of Education recognizes but cannot meet the monetary needs required to

serve students entitled under IDEA, ADA, and Section 504. Richert's analysis highlights

Critchfield's urgent push for additional funding, but also reveals a systematic policy

failure: when the state admits its own inadequacy in providing legally required resources,

local educational agencies (LEAs) inevitably respond by limiting efforts such as "child

find," failing to identify and serve all eligible students, and deepening budget shortfalls at

every level.  Kevin Richert. *Analysis: It's a bad time to discuss the special education*

*budget crisis — but it is time.* Idaho Education News, Sept. 2025.

https://www.idahoednews.org/top-news/analysis-its-a-bad-time-to-discuss-the-special-ed

ucation-budget-crisis-but-it-is-time/.  It is reasonable to assert that it is a systematic

policy failure rising to deliberate indifference of disabled children when IDOE admits

that they won't allocate the money necessary for its existing students covered under

IDEA, ADA and Section 504 that the LEA's are specifically going to purposely not strive

to fulfill their affirmative child find duty and exacerbate their budget shortfalls.

97) There is no record of IDOE considering this comment, and the only change they made

was to fix the incorrect formula that OSEP called to their attention, under threat, to make

the one word change. Idaho State Board members supported only a one word change

unanimously. Board President Linda Clark tried to get a sense of how it might affect

special education numbers. "Logic would tell me, President Clark, that the number would

go up," Cantrell said. "Logic would tell me it may go up significantly," Clark replied.

"It's a much less rigorous standard."  The IDOE Board then quantified the impact of the

budget. What they never did is acknowledge that because of these deficiencies there are

many children in Idaho that are suspected of having a disability, that were unidentified

for years and that they have a federal duty to "identify" and find these children. This

demonstrates IDOE's deliberate indifference to its obligations under federal law 20 U.S.

Code § 1412(a) to identify and serve all children with disabilities in Idaho, including the

Plaintiffs, and the sad monetary motive behind their systematic failure to comply with

IDEA, ADA and Section 504.

98) For an agency's consideration of public comments to be sufficient and not "arbitrary and

capricious," the agency must respond to significant comments with a reasoned

explanation that shows the comment was considered and an appropriate rationale was

provided for the agency's final decision.

99) The Letter to Delisle put IDOE on actual notice of their failures to "child find" children

with disabilities and higher cognitive functioning on numerous occasions, despite this

letter and also being sent their own actual policy of the importance of providing support

to "twice-exceptional" students. Diane Boothe, *Twice-Exceptional: Students with Both

Gifts and Challenges or Disabilities (Idaho Dep't of Educ. 2010)*,

https://scholarworks.boisestate.edu/fac_books/343/; also referenced *Best Practices

Manual for Gifted and Talented Programs in Idaho (Idaho Dep't of Educ. 2020)*.  IDOE

failed to bring its special education manual into compliance with its duties under IDEA,

ADA and Section 504. IDOE appeared to fail to even consider the June 7, 2024 comment

at all. The result from this deliberate indifference, is a failure to appropriately train

LEA's, and a state created danger, where unidentified students with disability are at much

heightened risk for mental illness, suicide, school resistance, severe emotional distress, etc.

100) As stated in the June 7, 2024, comment, children with learning disabilities are a vulnerable class, with substantial evidence of increased risks of mental illness, disrupted life trajectories and multiple times risk of death by suicide. Twice-exceptional kids, especially when unidentified and unsupported, are at a much-heightened risk of anxiety, depression and suicide. IDOE is failing to protect a vulnerable class of disabled children in violation of its legal obligations.

101) Female students, neurominorities, and LGBTQ+ individuals often have their disabilities unidentified at higher rates, experience increased bullying, and are more likely to be twice exceptional. This pattern demonstrates discrimination against protected classes under Idaho and federal law, warranting heightened scrutiny of state action.

102) IDOE and the District continue policies that systematically discriminate against many of those that have covered disabilities under Section 504, ADA and IDEA. The District has enacted a policy effective in 2025 that impacts C.M. and mandates that any missed attendance requires a medical provider's documentation or it is considered unexcused and may result in loss of credit. If a student leaves the classroom a few minutes early (perhaps for accommodation), it is considered truancy.  The District's policy does not recognize anxiety as a valid basis for standardized testing accommodations. Anxiety is not an allowed reason to not take any of the myriads of standardized tests. These policies and practices demonstrate deliberate indifference to the special needs of covered children under federal disability laws. Children, including the Plaintiffs, are told time and again, that their needs (covered under Section 504, ADA, and IDEA) are inconvenient and

against District and/or IDOE policies and are forced to "white knuckle" it to school despite these issues and it causes distinct, palpable, and increasing and foreseeable harm up to and including death of children.

103) Children with autism and ADHD are at a much increased risk of mental illness, and suicide death. Curtis L., Commentary: *Suicide risk is high, but often overlooked, in autistic spectrum disorder populations,* 63 J. Child Psychol. & Psychiatry 1089 (2022), https://pubmed.ncbi.nlm.nih.gov/35524741/; O'Halloran L., Coey P. & Wilson C., *Suicidality in autistic youth: A systematic review and meta-analysis,* 65 Clin. Psychol. Rev. 102154 (2022), https://www.sciencedirect.com/science/article/pii/S0272735822000290. This risk is exacerbated if these kids with covered disabilities are unidentified and unsupported. Casten L.G., Thomas T.R., Doobay A.F., Foley-Nicpon M., Kramer S., Nickl-Jockschat T., Abel T., Assouline S. & Michaelson J.J., *The combination of autism and exceptional cognitive ability is associated with suicidal ideation,* 197 Neurobiol. Learn. Mem. 107698 (2023), https://pubmed.ncbi.nlm.nih.gov/36450307/. IDOE and the District carried out policies and actions against M.M., C.M and S.M. that caused injury and death, deliberately, not because it is best for the unique interests of these disabled children, but because it is most friendly to their funding model which pays their salaries.

104) Many children with covered disabilities, including the Plaintiffs, have school hesitancy, bullying problems, testing and social anxiety and this policy makes it impossible to accommodate their needs. A disproportionate percentage of children in the District and Idaho with attendance issues are going to be identified as needing an IEP or 504, or as in

the case of the Plaintiffs unidentified but needing accommodations. The predominant reason for these draconian and cruel attendance policies and requirements is not for the "children's" benefit, but to keep a child's head in the trough to count as a unit for purposes of the District's and IDOE's funding model.  In other words, these agencies and decision makers have every financial incentive to keep kids "unidentified", keep them unaccommodated and use writ of law to force children to school despite their disabilities, their declining mental health, and common sense.  The further downstream impact is that for children with covered needs "that can't" go to school, it forces parents, like the Plaintiffs, to withdraw from public school and forgo FAPE and go for an education that doesn't do further harm to their children.  Deliberate indifference is built into the system and financially incentivized.

105) Plaintiffs filed a Notice of Tort Claim on or around April 10, 2024, to provide notice to the District and IDOE of an intent to pursue tort claims and provide actual notice of their failures to properly carry out federal Child Find mandates under Section 504, ADA and IDEA.

106) Despite actual notice regarding their deficiencies in fulfilling their Child Find mandate, and additional notice of deficiencies during its public comment period of revising the Idaho Special Education Manual over the summer of 2024, IDOE and the District have failed to enact any meaningful changes to either policy, procedures or their actions.  This wanton disregard of their duties to children in Idaho and the District meet, and actually exceed, the standard of deliberate indifference to Plaintiffs, and all similarly situated children in Idaho.

107) Boise School District has demonstrated a systematic pattern of supervisory failures to

protect children. These instances include the abuse of special education students by former aide Gavin Snow. Snow, employed at Valley View and Cynthia Mann elementary schools (where S.M. attended). Laura Boulton, teacher at Timberline High School, who filed multiple tort claims and lawsuits alleging retaliation for reporting abuse, defamation, and violation of her civil rights after district officials suspended her and barred her from district premises for advocating for student victims. Principal Christoper Ryan allegedly breached his supervision duties by allowing use of his office to a teacher under investigation of ongoing abuse, leaving children vulnerable to exploitation and harm. The cumulative cases and settlement with Boulton, alongside widespread reports and continued litigation, provide systemic evidence of failure to train, supervise, and protect disabled students, indicating deliberate indifference by the District. This also points to additional motives behind M.M.'s locker being emptied, all her documents destroyed, and no possessions returned to grieving parents James McCall and Samia McCall.

108) The Plaintiffs' losses are each in excess of $1 million.

## COUNT I: The District's Violation of Section 504 of the Federal Rehabilitation Act of 1973

*James McCall, as Administrator of the Estate of M.M. vs. Boise School District*

109) Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 108 as if fully set forth herein and the averments set forth in the preceding paragraphs are incorporated by reference here as though fully set forth at length.

110) Section 504 of the Rehabilitation Act of 1973, prohibits discrimination against individuals with disabilities by denying them equal access to or participation in federally

funded programs, such as failing to provide reasonable accommodation or services, or improperly excluding them from activities like classes or field trips.

111) A district may be in violation of Section 504 if it: does not provide necessary accommodations or services for students with disabilities, such as ramps, assistive technology or extra time on tests.

112) Denies a child with a disability access to educational services, programs, or activities, including field trips, clubs or graduation ceremonies.

**COUNT II: The District's Violation of Title II of the Americans with Disabilities Act**

*James McCall, as Administrator of the Estate of M.M. vs. Boise School District*

113) Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 112 as if fully set forth herein and the averments set forth in the preceding paragraphs are incorporated by reference here as though fully set forth at length.

114) Section 504 prohibits disability discrimination by recipients of federal funds. The statute provides that:

> "No otherwise qualified individual with a disability in the United States... shall, solely by reason of their disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency[...]." 29 U.S.C. § 794(a) (2023).794(a) (West).

115) Section 202 of the ADA similarly states:

> "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (2023)(West).

116) The same standards govern both Section 504 and ADA claims. *S.H. ex rel. Durrell v.*

*Lower Merion School District*, 729 F.3d 248, 260 (3d Cir. 2013). Thus, Counts I and II will be considered together in this complaint. The substantive provisions of both Title II and Section 504, by their plain terms, apply to "qualified individual[s]" with disabilities. 29 U. S. C. §794(a); 42 U. S. C. §12132. *A. J. T. v. Osseo Area Schools*, 605 U.S. ___ (2025) (Slip Op page 7).

117) Claims for compensatory damages under Section 504 and the ADA require a finding of intentional discrimination often demonstrated by plaintiffs when defendants act with "deliberate indifference". *Id*. On the other hand, injunctive relief does not require proving intent to discriminate. *Id.*

118) Deliberate indifference requires both (1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood. *Duvall v. Cnty. Of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001).

119) The deliberate indifference standard "does not require a showing of personal ill will or animosity toward the disabled person." *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011) (quoting *Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228-29 (10th Cir. 2009)).

120) An individual with a disability is defined under Section 504 and the ADA as a person who has a physical or mental impairment that substantially limits one or more major life activities. 42 U.S.C. § 12102(1); 29 U.S.C. § 705(20)(B). The statutes further state that "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

121) The District discriminated against M.M. as a direct result of her disability. More specifically, the District knew or should have known of her coverable conditions and had a duty and obligation to assess, accommodate and support any diagnoses but egregiously failed M.M. The District continues to fail to take the required steps to address these lapses in their child find duties despite actual notice of their failures. Child Find responsibilities are an affirmative obligation under Section 504 and ADA, as well as IDEA. The first step in fulfilling the affirmative child find duty—typically referred to as the "child-find" obligation—is of "paramount importance." *Forest Grove School Dist. v. TA*, 557 U. S. 230, 245 (2009). "States are obligated to 'identify, locate, and evaluate' 'all children with disabilities residing in the State' to ensure that they receive needed special-education services." *Ibid.* (quoting 20 U.S.C. 1412(a)(3)(A)) (brackets omitted); see also 34 C.F.R. 300.111; *Idaho Department of Education, Section 504 Practice Guide, Boise, ID (Jan. 15, 2024).*

122) It is also of paramount importance that LEA's are held accountable for following procedural and substantive requirements under the IDEA. *Timothy O. v. Paso Robles Unified School Dist.*, 822 F. 3d. 1105 (9th Cir. 2016). The breach of these procedural and substantive requirements is often detrimental to the child, their education and their parents, but in M.M.'s case, the consequences are devastating. In order to provide a free appropriate public education ("FAPE") to children with disabilities and provide accommodations under Section 504 and the ADA, each state must, of course, first identify those children and evaluate their disabling conditions. *Id.* "Once identified, those children must be evaluated and assessed for all suspected disabilities so that the school district can begin the process of determining what special education and related services

will address the child's individual needs." *Id.* at 1110.

123) Section 504 also has its own "child find" obligations. *BSM v. Upper Darby School Dist.*, 103 F. 4th 956 (3d Cir. 2024). Section 504 has different remedies that are available under IDEA, including compensatory damages, equitable relief, injunctive relief and declaratory actions. *Perez v. Sturgis Public Schools*, 598 U.S. 142 (2023); *Le Pape v. Lower Merion School District*, 103 F. 4th 966 (3rd Cir. 2024). A FAPE is no longer a remedy that will help M.M., nor is it possible due to the failures of the District to carry out its legal duties. The remedies under Section 504 and ADA are particularly relevant versus seeking administrative remedies for a FAPE or requesting accommodations, again, for a Section 504 "plan".

124) "Regulations clarifying what constitutes a disability under the ADA state that 'major depressive disorder, bipolar disorder, post-traumatic stress disorder, obsessive compulsive disorder, and schizophrenia' substantially limit major life activities and should be considered disabilities." *Jones v. Thomas Jefferson Univ. Hosps., Inc.*, 2019 WL 5588824, at *8 (E.D. Pa. Oct. 29, 2019) (quoting 29 C.F.R. § 1630.2(j)(3)(iii)). Similarly, autism and ADHD are covered disabilities as well. "Crucially, Section 504 defines disability more broadly than IDEA. . . ." *B.S.M. v. Upper Darby School Dist.*, 103 F. 4th 956 (3d Cir. 2024). at 963. Section 504 defines disability to include "any mental or psychological disorder, such as intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disabilities." *Id.*, citing 34 CFR §104.3(j)(2)(i)(B). Additionally, Section 504 includes those with "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including

speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine." *Id.*, citing 34 CFR §104.3(j)(2)(i)(A).

125) The District's counselor specifically voiced concerns of possible obsessive-compulsive conditions with M.M. and suggested the parents reach out to an out of state specialist. This alone obviously triggered the district's affirmative Child Find obligations and deprived plaintiffs of their due process rights. 34 C.F.R. § 104.36.  Red flags for disability, cries for help and accommodations were ignored again and again by the District.

126) M.M. was hospitalized after a suicide attempt, the District was sent letters from mental health professionals, and the parents asked specifically for support and accommodations that were ignored. The hospitalization and further treatment put the District on explicit notice of M.M.'s disability and obviously triggered the District's Child Find obligations which were continuously and repeatedly triggered and ignored throughout M.M.'s time in the District. However, the District failed to initiate an evaluation, it failed to take any steps to support M.M. following her treatment. M.M., and her parents were deprived of their due process rights under Section 504, IDEA and the ADA, which became abundantly clear when accommodations were requested for C.M. ████████████ ██████████████████████.

127) The District clearly had knowledge that harm to a federally protected right was substantially likely, and yet failed to act upon that likelihood. Moreover, it is clear that the District has a policy of not attempting any "Child Find" assessments for children that are muddling through, or in the case of all the McCall children "academically" succeeding. This is in direct contravention to guidance from OSEP that all children, not just those

with low cognition are covered under IDEA. OSEP Memo 15-08 Letter to Delisle: Children with disabilities with high cognition (April 17, 2015) and case law See generally, *L.J. v. Pittsburg Unified School District, 850 F. 3d 996 (9th Cir. 2017)*, *A.P. v Pasadena Unified School District*, 19-7965-MWF (MWJ) (Jan. 26, 2021).

128) Despite possessing actual knowledge of M.M.'s disabilities and related needs, the District failed to provide her with the accommodations required to provide her with equal access to their education and due process rights under Section 504.

129) Moreover, the District maintains a policy and practice of ignoring students' mental health needs, neurodivergence and fails to properly train and supervise its personnel in handling and supporting students who require this support.

130) As such, the District acted with deliberate indifference toward M.M. in violation of Section 504 and the ADA.

131) The District's deliberate indifference is sadly monetarily motivated and clearly continues a deplorable systematic pattern of ignoring Child Find duties and due process responsibilities for any children that have normal and especially high cognitive abilities. The District should be enjoined from continuing this practice that is failing and literally killing children. Though it is clear that the District's behavior rises to deliberate indifference, injunctive relief does not require such a showing. *A. J. T. v. Osseo Area Schools*, 605 U.S. ___ (2025).

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court award Plaintiffs all appropriate remedies available under Section 504 and the ADA for the above-outlined violations.

**COUNT III: The District's Violation of Section 504 of the Federal Rehabilitation Act of 1973**

*James McCall and Samia McCall, as parents and legal guardians of C.M. vs. Boise School District*

**COUNT IV: The District's Violation of Title II of the Americans with Disabilities Act**

*James McCall and Samia McCall, as parents and legal guardians of C.M. vs. Boise School District*

132) Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 131 as if fully set forth herein and the averments set forth in the preceding paragraphs are incorporated by reference here as though fully set forth at length.

133) Section 504 prohibits disability discrimination by recipients of federal funds. The statute provides that:

> "No otherwise qualified individual with a disability in the United States... shall, solely by reason of their disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency[...]. 29 U.S.C. §794(a) (West).

134) Section 202 of the ADA similarly states:

> "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132 (West).

135) The same standards govern both Section 504 and ADA claims. *S.H. ex rel. Durrell v. Lower Merion School District*, 729 F.3d 248, 260 (3d Cir. 2013). Thus, Counts III and IV

will be considered together in this complaint. The substantive provisions of both Title II and Section 504, by their plain terms, apply to "qualified individual[s]" with disabilities. 29 U. S. C. §794(a); 42 U. S. C. §12132. *A. J. T. v. Osseo Area Schools*, 605 U.S. ___ (2025) (Slip Op #7).

136) Claims for compensatory damages under Section 504 and the ADA require a finding of intentional discrimination often demonstrated by plaintiffs when defendants act with "deliberate indifference".  *Id*.  Injunctive relief on the other hand does not require proving intent to discriminate.  *Id.*

137) Deliberate indifference requires both (1) knowledge that a harm to a federally protected right is substantially likely," and (2) "a failure to act upon that likelihood." *Duvall v. Cnty. Of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001).

138) The deliberate indifference standard "does not require a showing of personal ill will or animosity toward the disabled person." *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011) (quoting *Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228-29 (10th Cir. 2009)).

139) An individual with a disability is defined under Section 504 and the ADA as a person who has a physical or mental impairment that substantially limits one or more major life activities. 42 U.S.C. § 12102(1); 29 U.S.C. § 705(20)(B). The statutes further state that "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

140) The District discriminated against C.M as a direct result of his disabilities. C.M. 's

educational history is replete with facts and details regarding covered disability that were ignored,  The time between when he entered the District and was identified through private assessment was approximately 10 years.  This failure to fulfill its affirmative obligations to Child Find, under ADA, Section 504 and IDEA has limited his educational and life opportunities and therefore was denied the educational benefits provided by law for the unique needs of C.M.

141) Despite this, the District failed to ever initiate an evaluation, and C.M. was thereby harmed, suffered the loss of his sister, and suffered harm as a result in a manner analogous to *Perez* where failures compound.

142) Moreover, the District maintains a policy and practice of ignoring students' mental health needs, and fails to properly train and supervise its personnel in handling and supporting students who require this support.

143) As such, the District acted with deliberate indifference toward C.M in violation of Section 504 and the ADA.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court award Plaintiffs all appropriate remedies available under Section 504 and the ADA for the above-outlined violations.

### COUNT V: The District's Violation of Section 504 of the Federal Rehabilitation Act of 1973

*James McCall and Samia McCall, as parents and legal guardians of S.M. vs. Boise School District*

**COUNT VI: The District's Violation of Title II of the Americans with Disabilities Act**

*James McCall and Samia McCall, as parents and legal guardians of S.M. vs. Boise School District*

144) Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 143 as if fully set forth herein and the averments set forth in the preceding paragraphs are incorporated by reference here as though fully set forth at length.

145) Section 504 prohibits disability discrimination by recipients of federal funds. The statute provides that:

> "No otherwise qualified individual with a disability in the United States... shall, solely by reason of their disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency[...]. 29 U.S.C. §794(a) (West).

146) Section 202 of the ADA similarly states:

> "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132 (West).

147) The same standards govern both Section 504 and ADA claims. *S.H. ex rel. Durrell v. Lower Merion School District*, 729 F.3d 248, 260 (3d Cir. 2013). Thus, Counts V and VI will be considered together in this complaint. The substantive provisions of both Title II and Section 504, by their plain terms, apply to "qualified individual[s]" with disabilities. 29 U. S. C. §794(a); 42 U. S. C. §12132. *A. J. T. v. Osseo Area Schools*, 605 U.S. ___

(2025).

148) Claims for compensatory damages under Section 504 and the ADA require a finding of
intentional discrimination often demonstrated by plaintiffs when defendants act with
"deliberate indifference". *Id.* Injunctive relief on the other hand does not require proving
intent to discriminate. *Id.*

149) Deliberate indifference requires both (1) knowledge that a harm to a federally protected
right is substantially likely," and (2) "a failure to act upon that likelihood." *Duvall v. Cnty.
Of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001).

150) The deliberate indifference standard "does not require a showing of personal ill will or
animosity toward the disabled person." *Meagley v. City of Little Rock*, 639 F.3d 384, 389
(8th Cir. 2011) (quoting *Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228-29 (10th
Cir. 2009)).

151) An individual with a disability is defined under Section 504 and the ADA as a person
who has a physical or mental impairment that substantially limits one or more major life
activities. 42 U.S.C. § 12102(1); 29 U.S.C. § 705(20)(B). The statutes further state that
"major life activities include, but are not limited to, caring for oneself, performing
manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending,
speaking, breathing, learning, reading, concentrating, thinking, communicating, and
working." 42 U.S.C. § 12102(2)(A).

152) The District discriminated against S.M. as a direct result of their disabilities.
Specifically, the District knew not only that S.M. had ███████████████

████████████████████████████████████████████

educational programming, but also actively making it clear that only full attendance would be acceptable. S.M. 's history ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████

153) Despite this, the District failed to ever initiate a step in its affirmative "Child Find" duty towards an evaluation in all areas of suspected disability, and S.M. was thereby harmed, suffered the loss of his sister, and will almost certainly be unable to get a FAPE.

154) The District clearly had knowledge that harm to a federally protected right was substantially likely, and yet failed to act upon that likelihood. Despite possessing actual knowledge of S.M. 's disabilities and related needs, the District failed to timely provide them, first with identification under Child Find responsibilities, but vicariously with the accommodations required to provide S.M. with equal access to their education. In this time S.M. 's parents voiced concerns that S.M. had about the lunch room being a place where ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████

155) Moreover, the District maintains a policy and practice of ignoring students' mental health needs, and fails to properly train and supervise its personnel in handling and supporting students who require this support.

156) As such, the District acted with deliberate indifference toward S.M. in violation of

Section 504 and the ADA.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court award Plaintiffs all appropriate remedies available under Section 504 and the ADA for the above-outlined violations.

**COUNT VII: The District's Violation of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act: Associational Discrimination**

*James McCall and Samia McCall, in their individual capacities. vs. Boise School District and IDOE*

157) Plaintiffs reallage and incorporate by reference the allegations of paragraphs 1 through 156 as if fully set forth herein and the averments set forth in the preceding paragraphs are incorporated by reference here as though fully set forth at length.

158) A plaintiff asserting an associational discrimination claim under Section 504 and Title II of the ADA must plausibly allege: (1) a logical and significant association with an individual with disabilities; (2) that a public entity knew of the association; (3) that the public entity discriminated against them because of that association; and (4) they suffered a direct injury as a result of the discrimination. *Schneider v. Cnty. of Will, State of Illinois*, 190 F. Supp. 2d 1082, 1088 (N.D. Ill. 2002) (citing 28 C.F.R. §35.130(g)); *Daubert v. City of Lindsay 2014*, E.D. Cal., 37 F. Supp. 3d 1168.

159) The first two elements of an associational claim are easily met in the present matter. James McCall and Samia McCall are parents of M.M., C.M., and S.M. The McCall children are all students with disabilities. Furthermore, the District knew of this association. James McCall and Samia McCall are similar people with disabilities that are

covered by the ADA and Section 504.

160) The District discriminated against James McCall and Samia because of their association with the McCall children by failing to provide them with sufficient support and support for their disabled children.

161) The District pervasively, indignantly, cruelly, and consistently ignored James McCall and Samia's concerns and requests for accommodations, which directly resulted in all the McCall children being denied appropriate supports, as well as access to their education, and due process rights under the ADA, Section 504 and IDEA. This also prevented James McCall and Samia McCall from effectively advocating for the McCall children as a member of either an IEP or Section 504 Plan team until after the McCall's sought assessment privately for the McCall Children.

162) As a result of the anxiety and stress they experienced because of the incidents described in this Complaint, James McCall and Samia McCalls' ███████████████ ████████ James McCall and Samia McCall both have suffered direct injuries as a result of the associational discrimination.

163) Additionally, by depriving James McCall and Samia McCall as parents of their due process rights under the ADA and Section 504, the McCalls are specifically enjoined from ever seeking appropriate support for M.M. and Sawyer McCall.  Parents specifically have due process rights under Section 504 and the ADA and James McCall and Samia McCall were deprived of these rights due to the deliberately indifferent and systematic failure of the District and IDOE to Child Find, follow the due process requirements and support the McCall Children with disabilities. *Timothy O., 822 F.3d at 1119.,* 34 C.F.R. § 104.36

164) Many parents of children with disabilities only learn of their disability after a child is properly assessed under the Child Find obligations. There is a significant heritability component of many covered conditions under the ADA, Section 504. In other words children with disabilities are also much more likely to have parents with disabilities covered under ADA and Section 504. Therefore, the District deliberately ignoring all the reasonable concerns voiced about their children, ignoring its affirmative Child Find duties, and ignoring James McCall and Samia's due process rights under the law, resulted in great and compounding difficulties with James McCall and Samia's unidentified and unsupported disabilities. This meets the further requirements (3) and (4) of the requirements to make out an associational discrimination claim.

165) Therefore, James McCall and Samia McCall have suffered discrimination on the basis of their association with M.M., C.M. and S.M., all children with disabilities, due to the District's actions and inactions.

**WHEREFORE**, Plaintiffs respectfully request that this Court award them all remedies available under Section 504 and the ADA for these violations, including monetary damages, attorneys' fees and costs, and all other relief this Honorable Court deems appropriate.

## COUNT VIII: The District's Violation of Fourteenth Amendment Liberty Interest Denial of M.M.'s Right to Life and their Right to Liberty Interest in Bodily Integrity, and for the Denial of Parent's Liberty Interests in the Care of their Child

166) Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 165 as if fully set forth herein and the averments set forth in the preceding paragraphs are incorporated by reference here as though fully set forth at length.

167) The Fourteenth Amendment of the United States Constitution provides that no State

shall "deprive any person of life, liberty, or property, without due process of law."

168) To state a Due Process claim under Section 1983, a plaintiff must identify a protected liberty or property interest; demonstrate that the deprivation of that interest by a state actor rises to deliberate indifference; causation between the state actor's conduct and the deprivation; and action under color of state law. *Wood v. Ostrander,* 879 F.2d 583 (9th Cir. 1989). Deliberate indifference is shown where a state actor, with actual knowledge of a serious risk, consciously disregards that risk through affirmative conduct or inaction. *Kennedy v. City of Ridgefield*, 411 F.3d 1134 (9th Cir. 2005).

169) Additionally, "the interest of parents in the care, custody, and control of their children are perhaps the oldest fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000).

170) James McCall and Samia McCall possessed a liberty interest, guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, in the parenthood and companionship of their child, and the maintenance and integrity of their family.

171) Plaintiff alleges that the District's wrongful actions against M.M. and their family were done under the color of state law with deliberate indifference, and deprived them of the rights, privileges, and immunities guaranteed to them under the Fourteenth Amendment of the United States Constitution.

172) Specifically, Plaintiff alleges that Defendant violated their right to life and liberty under the law when it callously disregarded M.M.'s emotional and mental health needs and fragility. The School District knowingly and deliberately failed to implement adequate policies, training, and identification protocols to recognize and address the unique

vulnerabilities faced by students in protected classes, including girls (based on sex), individuals with disabilities, neurominorities, and those with gender and sexual identity issues (including LGBTQ+ students), in violation of the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983. Despite being aware of substantial evidence from national studies, local incident reports, and expert recommendations indicating that members of these protected classes experience disproportionately higher rates of bullying, harassment, exclusion and death, the District persisted in its indifference, resulting in a systemic denial of equal educational opportunities and support services. This deliberate failure directly and proximately caused elevated levels of anxiety, depression, and suicidal ideation among affected students, including M.M. and culminated in her death and severe emotional and physical harm.

173) Further, Plaintiffs allege that the District violated their right to life and liberty under the law by ignoring M.M.'s need for support and accommodations. Under 42 U.S.C. § 1983, it is unconstitutional for state, federal and local governments to deprive children of their rights protected under the United States Constitution. Being neurodiverse also means that they are necessarily a neurominority. The differences (especially when unidentified) put children in a position where they are systematically shamed, bullied and often made to do things that are painful and lead to anxiety. Touch, forced eye contact, forced verbal communication, noises, lights, etc., can lead to physical and mental pain, and neurodiverse folk are magnets for peer and teacher bullying. Though the BSD seems to have difficulties identifying those neurodiverse students with disabilities, such as ADHD and ASD, their peers and bullies seem to be able to identify very quickly. School psychologist, Dr. Angela Kulm, has a heightened duty to assess for all areas of possible

disability and not discriminate against neurominorities.

174) The Supreme Court has characterized education as "the most important function of state and local governments" and the deprivation will take an "inestimable toll of that deprivation on the social, economic, intellectual, and psychological well-being of the individual, and the obstacle it poses to individual achievement, make it most difficult to reconcile the cost or the principle of a status-based denial of basic education with the framework of equality embodied in the Equal Protection Clause." *Plyler v. Doe*, 457 U.S. 202 (1982).

175) The Supreme Court has also previously made clear that cost cutting is an insufficient reason for denying benefits to a discrete group. Id., *Latta v. Otter, 19* F. Supp. 3d 1054 (D. Idaho 2014), aff'd, 771 F.3d 456 (9th Cir. 2014).

176) As a result of Defendant's callous disregard, culminating in a final failure to protect M.M. from the emotional abuse she suffered at school and failing to provide her and her parents with the support they needed, it was a direct and proximate cause of her death on November 2, 2023 and she suffered considerable harm before then. Through creating an environment that is knowably, provably, and demonstrably creating harm to children with disabilities, such as OCD, ADHD, ASD it is creating a literal state controlled danger to children under their care. Specifically, Angela Kulm and principal Helga Frankenstein have heightened duty and knowledge that both disability and higher cognitive ability often coexist, and that it is foreseeable that failing to identify, assess and support lead to harm and death.

177) These actions, and failures to act, under color of law deprive a specific class of people, here neurominority children with higher cognitive abilities, of rights protected under the

14th Amendment of the United States. Race, gender, and sexual orientation all engender a higher scrutiny over state actions that harm those classes. Similarly, the District and IDOE operating under color of law systematically engage in discrimination against neurominorities that have difficulty understanding social nuance, speaking, socially engaging, and understanding nonverbal communication.

178) It is time that the BSD stops talking about celebrating diversity and starts embracing it, accommodating it and helping each unique child obtain an educational benefit that embraces them holistically and perhaps more importantly doesn't actively harm them through systemic abuse and ableism.

179) These actions deprived M.M. of her constitutionally protected liberty interest in bodily integrity.

180) The District's actions also deprived James McCall and Samia McCall of their liberty interest in the care of their child.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court award Plaintiffs all remedies available under Section 1983 for these violations including monetary damages, attorneys' fees and costs, and all other relief that this Honorable Court deems appropriate.

## COUNT IX: Failure to Train

*All Plaintiffs v. All Defendants*

181) Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through

180 as if fully set forth herein and the averments set forth in the preceding paragraphs are incorporated by reference here as though fully set forth at length.

182) Although a school district may not be sued for an injury inflicted solely by its employees or agents under Section 1983: ... it is when execution of a government's policy or custom, whether made by its lawmaker or by one whose edits or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983. *Trevino v. Gates,* 99 F.3d 911 (9th Cir. 1996) (citing *Monell v. Dept. of Social Services of the Cty. of N.Y.*, 436 U.S. 658, 694 (1978)); *Roe ex rel. Callahan v. Gustine Unified School Dist. 2009*, E.D. Cal., 678 F. Supp. 2d 1008.

183) More specifically, inadequacy of training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the state employees at issue come into contact. *Oviatt v. Pearce*, 954 F.2d 1470 (9th Cir. 1992) (*citing City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). A claim for inadequate training will succeed if a plaintiff 'can establish that the identified deficiency in the defendant's training program is closely related to the injury' suffered by the plaintiff. *Id*.

184) The District is liable for the wrongful conduct of its employees and agents, as the decision makers failed to create and implement a policy and practice of properly identifying students with disabilities and mental health needs, if they were not also cognitively impaired.

185) The District is liable for the wrongful conduct of its employees and agents, as the decision makers failed to train and supervise its agents and employees charged with the care and custody of students with mental health needs requiring special education

support.

186) Similarly, IDOE's pervasive failure to even try to identify children with disabilities, to hold the LEA's accountable or follow policy guidance, such as the Letter to Delisle, or legal precedent. When faced with demonstration that their Special Education Manual was deficient, after many years, they never even tried to identify the children that fell through the cracks.

187) Plaintiffs further allege that IDOE, the District, Dave Wagers, Helga Frankenstein, and Pam Dietz all fail to educate, train, and supervise employees under their supervision of the rights of students to be free from discrimination.  This systematic ableism, to ignore disabled students, neurominority students, amounts to an official policy, practice, and custom and caused a deprivation of M.M. 's and their family's Fourteenth Amendment right to life and liberty, respectively.

188) The District's failure to adequately train amounts to deliberate indifference to the rights of vulnerable students like M.M., C.M and S.M.

189) Because of the District's wrongful conduct, M.M. and all the plaintiffs suffered as outlined in this Complaint.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court find that the District failed to train its staff and agents as required, and thus grant relief as is appropriate and necessary.

## COUNT X: IDOE's Violation of Section 504 and the IDEA

*All Plaintiffs v. IDOE*

190) Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 189 as if fully set forth herein and the averments set forth in the preceding paragraphs are incorporated by reference here as though fully set forth at length.

191) Under the IDEA and Section 504, IDOE is the State Education Agency ultimately responsible for the implementation of both statutes by Local Education Agencies ("LEAs") such as Boise School District.

192) Plaintiffs assert that IDOE failed in its obligation to ensure non-discrimination against protected handicapped students under Section 504 and the IDEA by failing to provide sufficient regulations, guidance, supervision, investigation, training, and enforcement, thereby permitting the District's unlawful practices regarding the identification of students with mental health conditions to continue.

193) Under the IDEA, any state receiving federal funds is entrusted with "general supervisory responsibilities" and must have policies and procedures to ensure, among other things, that it provides a free appropriate public education to all children with disabilities in a state. 20 U.S.C. §1412(A).

194) The state also has the power to allocate IDEA funds towards supporting and directing personnel development and training, assisting local education agencies in meeting personnel shortages, and making sub-grants to local educational agencies to help them provide direct services and "in making systemic change to improve results for children with disabilities." *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 2004 WL 633222, at *21-22 (E.D. N.Y. 2004) citing 20 U.S.C. §1411(f)(3), (f)(4)(A).

195) Given the broad statutory supervisory responsibilities accorded to state educational agencies, in cases such as this where Plaintiffs have alleged systemic violations of IDEA

and Section 504, courts have found that the state is a proper party to the action. *Morgan Hill Concerned Parents Ass'n v. Cal. Dep't of Educ. 2017,* E.D. Cal., 258 F. Supp. 3d 1114 *citing Beth V. by Yvonne V. v. Carroll*, 87 F.3d 80 (3d Cir. 1996).

196) Upon information and belief, the District's failures to appropriately identify and program for students with emotional and mental health needs are directly related to IDOE's failures to supervise, guide, investigate, train, and enforce Section 504 and the IDEA.

197) M.M. exemplifies a student that should have been comprehensively assessed and should have received additional resources and accommodations to support her unique and specific needs. The IDOE fails to ensure that LEA's under its umbrella, and the employees and agents of LEA's are making reasonable efforts to comply with their affirmative Child Find duties for ADA and Section 504, and IDEA, M.M. 's educators failed to provide any individualized support to M.M., ignored clear warning signs and dismissed the McCall's' explicit and reasonable requests for accommodations to M.M. 's education. The application of policies and testing protocols at the state level further contributed to M.M.'s mental health and ultimate death by suicide.

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court issue a declaration finding IDOE in violation of Section 504 and the IDEA. Plaintiffs further request injunctive relief requiring the revision of IDOE's supervisory practices regarding the identification and protection of handicapped students by Local Education Agencies ("LEAs").

## COUNT XI: WRONGFUL DEATH

**COMPLAINT AND DEMAND FOR JURY TRIAL  - 56**

*James McCall and Samia McCall, as heirs of M.M. v. all Defendants*

198) Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 197 as if fully set forth herein and the averments set forth in the preceding paragraphs are incorporated by reference here as though fully set forth at length.

199) Pursuant to Idaho Code § 5-311, Plaintiffs James McCall and Samia McCall, as the natural parents and heirs of the decedent, M.M., maintain this action for damages arising from the death of M.M. which was caused by the wrongful act or neglect of the Defendants. The IDOE and the District were negligent and they breached their affirmative duty to identify, locate, and evaluate students with disabilities, as mandated by the "child find" provisions under the IDEA, ADA, and Section 504.  It is reasonably foreseeable that death and mental illness will increase for those disabled children that are unidentified, unaccommodated and having severe emotional disturbances.

200) Additionally, the District had a heightened duty to M.M as it had actual knowledge that she was at a heightened risk for injury and death. Additionally, the District failed to provide the necessary additional support and services required by law when Plaintiff's requested a 504 Plan and a Reintegration Plan.

201) Moreover, both IDOE and the District neglected to follow their own established policies and procedures regarding suicide prevention and postvention, further exacerbating the risk and failing in their duty of care to protect M.M.

202) As a direct and proximate result of the Defendants' wrongful acts or neglect, Plaintiffs have suffered: (1) special damages, including funeral and burial expenses of $5,000 and medical expenses incurred prior to death of $10,000; and (2) general damages, including loss of support, services, companionship, and society; loss of future earnings and

economic contributions; and emotional distress, grief, and mental anguish; all in amounts to be proven at trial.

203) The total damages exceed $1,000,000, exclusive of interest and costs. Pursuant to Idaho Code § 6-926, damages for claims arising out of one occurrence shall not exceed $500,000 per claimant and $500,000 per occurrence regardless of the number of persons injured or the number of claimants, unless the governmental entity has purchased applicable, valid insurance coverage exceeding these limits.

204) Plaintiffs filed a Notice of Tort Claim against IDOE and the District (attached) on April 10, 2024 pursuant to Idaho Code § 6-905, which was within 180 days of M.M.'s death on November 2, 2023. The Notice of Tort Claim contained all information required by Idaho Code § 6-907, and Defendants have failed to respond.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter an Order:

1) Assuming jurisdiction of this case;

2) Awarding Plaintiffs all remedies available under the United States Constitution and Section 1983 for these violations, including monetary damages, attorneys' fees and costs, and all other relief this Honorable Court deems appropriate;

3) Declaring that the District violated Section 504 of the Rehabilitation Act, and that it did so with deliberate indifference;

4) For judgment in favor of Plaintiffs and against the District;

5) Plaintiffs request a permanent injunction or declaratory relief for the purpose of

mandating Boise School District and IDOE fulfill their obligations under federal law, including but not limiting its Child Find Obligations and providing these children and their parents with their due process rights under the law to prevent further harm to Plaintiff's children and all children similarly situated.

6) Declaring that the District discriminated against M.M., CM, SM on the basis of their disability in violation of Title II of the Americans with Disabilities Act;

7) Declaring that the District discriminated against M.M., CM, SM on the basis of their disability in violation of Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act;

8) Declaring that the District's policies and procedures violate Section 504 of the Rehabilitation Act, Title II of the ADA, and the IDEA;

9) Declaring that Defendant violated the rights of Plaintiffs to life and liberty under the Fourteenth Amendment of the United States Constitution, by way of Section 1983;

10) Enjoining Defendant from future implementation of its unlawful practice and policy;

11) Declaring that IDOE violated Section 504 and the IDEA;

12) Issuing injunctive relief requiring IDOE to: (1) implement specific procedures for monitoring LEA compliance with Child Find obligations; (2) establish mandatory training programs for LEA staff regarding identification of students with disabilities; (3) create and maintain a centralized reporting system for tracking potential Child Find violations; and (4) conduct quarterly audits of LEA special education programs revise its supervisory practices regarding the identification and protection of disabled and handicapped students by Local Education Agencies; and

13) Award compensatory damages exceeding $1,000,000 per plaintiff, including: (a) economic damages: $15,000 for M.M.'s medical and funeral expenses, plus $15,000 costs for C.M. and S.M.'s private assessments, therapies, losses of future earnings associated with disruption to life trajectory, and education; (b) non-economic damages: emotional distress, grief, loss of companionship, and pain and suffering for all plaintiffs; and

14) Awarding attorneys' fees and costs under the IDEA, the ADA, and Section 504; and Idaho law; and

15) Award punitive damages against individual defendants, excluding governmental entities, upon proof of oppressive, fraudulent, malicious or outrageous conduct by clear and convincing evidence, pursuant to Idaho Code § 6-1604; and

16) For such other relief as the Court deems just and equitable under the circumstances.

Dated September 15, 2025

_____/s/ James K. McCall_____
James McCall, Esq.
Idaho Attorney ID 7285
368 Sherman Street
Boise, ID 83702
Telephone: 208-731-4897
Email: jameskmccall@gmail.com
*Attorney for Plaintiffs*

**DEMAND FOR JURY TRIAL**

Plaintiffs, through counsel, hereby demand a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38(b) and Idaho Rule of Civil Procedure 38(b).

Dated September 15, 2025

_____ /s/ James K. McCall
_____ James McCall, Esq.
Idaho Attorney ID 7285
368 Sherman Street
Boise, ID 83702
Telephone: 208-731-4897
Email: jameskmccall@gmail.com
*Attorney for Plaintiffs*